UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SFX INSTALLATION, INC., | : |
| Plaintiff, | : |
| | : CASE NO.: _____ |
| v. | : |
| JERAL PIMENTEL and TRANSCENDENT BUILDERS CONSTRUCTION CORP., | : |
| Defendants. | : |

## COMPLAINT

Plaintiff, SFX Installation, Inc. ("SFX"), hereby submits this Complaint against Defendants, Jeral Pimentel ("Mr. Pimentel") and Transcendent Builders Construction Corp. ("Transcendent") (Mr. Pimentel and Transcendent are, collectively, "Defendants"). For its Complaint, SFX avers as follows:

## INTRODUCTION

1. In this action, SFX seeks injunctive relief and monetary damages against its former employee, Mr. Pimentel, who while being paid by SFX and ostensibly working for it, was surreptitiously using its tools and employees to start his own competing business, Transcendent.

2. As set forth below, Mr. Pimentel, who was in charge of a crew of SFX's employees, would request that those employees work on projects for Transcendent.

3. Defendants also used SFX's tools and equipment to complete the work that Mr. Pimentel took for Transcendent.

4. In other words, Mr. Pimentel stole SFX's labor and equipment to build his own business to compete with SFX.

5. If that were not bad enough, Mr. Pimentel posted photographs of SFX's completed projects on Defendants' website and social-media accounts, as examples of Transcendent's work.

6. In addition to taking SFX's labor and equipment, Mr. Pimentel also used its confidential business information to solicit its customers for Transcendent, and to undercut SFX's bids on projects for those customers.

7. To this day, Defendants use SFX's confidential customer information to underbid SFX on projects with its customers, and to take the work for Transcendent.

8. If Defendants' unlawful conduct is not curtailed, SFX will continue to lose revenue, customer relationships, and market share, as a result of Defendants' continued misappropriation of its confidential customer information.

9. In addition, SFX has been damaged by Defendants' theft of its labor and equipment to create Transcendent at the expense of SFX.

10. For these reasons and as set forth below, SFX brings this action seeking injunctive relief to prohibit Defendants' continued misappropriation of its customer information.

11. SFX also seeks an award of monetary damages as follows: (i) The value of the equipment and labor that was taken by Defendants, (ii) the profits that SFX lost from customers usurped by Defendants; and (iii) the revenue derived by Defendants through their unauthorized investment of SFX's labor and equipment into Transcendent.

**PARTIES**

12. Plaintiff, SFX, is a corporation formed and existing under the laws of the State of New Jersey, with its principal office located at 2039 Briggs Road, Mt. Laurel Township, New Jersey.

13. SFX is a construction company that is engaged primarily in the installation and renovation of science laboratories.

14. Specifically, SFX is hired by the manufacturers of furniture and equipment for scientific laboratories (as well as the manufacturers' dealers), to install the furniture and equipment and the locations of the manufacturers' customers. In other words, SFX's customers are the manufacturers and dealers of laboratory equipment and furniture.

15. SFX performs construction services in several different states, *i.e.* New Jersey, New York, Pennsylvania, Connecticut, Delaware, and Maryland. In other words, SFX's services are used, and are intended for use, in interstate commerce.

16. Defendant, Mr. Pimentel, is an adult individual, and resident of the State of New Jersey, with an address at 103 Ashburn Avenue, Manahawkin, New Jersey.

17. Mr. Pimentel is a former employee of SFX.

18. While Mr. Pimentel was still employed with SFX, he formed Transcendent.

19. Defendant, Transcendent, is a corporation formed and existing under the laws of the State of New York, with its principal office at 103 Ashburn Avenue, Manahawkin, New Jersey.

20. Mr. Pimentel is the president of Transcendent.

21. Mr. Pimentel, upon information and belief, is Transcendent's only shareholder.

22. Like SFX, Transcendent installs laboratory furniture and equipment, pursuant to contracts with the manufacturers. In other words, Transcendent competes with SFX for business with manufacturers of laboratory furniture and equipment.

23. Mr. Pimentel used Transcendent to compete with SFX, while he was still employed by SFX, and used SFX's workers and equipment to do so.

**JURISDICTION & VENUE**

24. The Court has original jurisdiction over this action, pursuant to 28 U.S.C.A. § 1331, as the subject matter of this action arises under the laws of the United States. Specifically, SFX brings a cause of action against Defendants arising under the Defend Trade Secrets Act (the "DTSA"), 18 U.S.C.A. § 1836. This Court has supplemental jurisdiction over SFX's non-DTSA claims, pursuant to 28 U.S.C.A. § 1367(a), as they are so related to SFX's DTSA claim that they form part of the same case and controversy.

25. Venue in this judicial district is proper under 28 U.S.C.A. § 1391(b), because the Defendants reside in the State of New Jersey, and a substantial part of the events giving rise to the SFX's claims arose there.

**FACTUAL ALLEGATIONS**

A.   **SFX Hires Mr. Pimentel, And Promotes Him To Foreman.**

26. On December 19, 2016, SFX hired Mr. Pimentel as a carpenter.

27. In or about December 2018, SFX promoted Mr. Pimentel to the position of foreman.

28. As a foreman for SFX, Mr. Pimentel was put in charge of a crew of SFX's employees, and had the authority to manage them, and to direct their work on SFX's projects.

29. More specifically, Mr. Pimentel was placed in charge of SFX's "north crew," which performed projects located in New York, Connecticut, and in New Jersey north of Princeton.[1]

30. Mr. Pimentel's position as foreman gave him access to SFX's vehicles and equipment for use on SFX's projects.

---

[1] SFX also has a "south crew," which covers the area between Princeton, New Jersey, and northern Maryland. SFX's workers are generally assigned to the crew that covers the location of their residence.

31. In addition to vehicles and equipment, Mr. Pimentel was also given access to SFX's virtual private computer network ("VPN"), which contains the information that SFX uses to craft bids and estimates for its customers, as well as the bids and estimates that had been accepted by SFX's customers in the past. In other words, the VPN contained information that allowed SFX employees to identify known consumers of its services, and to fashion bids at prices that it knew those consumers would accept and pay.

32. Because SFX considers this customer pricing information to be confidential, and a protected trade secret, only employees of rank (such as foremen) are given access to the VPN.

B. **While Still Employed By SFX Mr. Pimentel Creates Transcendent To Compete With SFX, Using SFX's Workers And Equipment.**

33. On December 30, 2020, Mr. Pimentel abruptly quit his position as a foreman with SFX.

34. At the time that he quit his position, he informed SFX only that he was leaving to work for a general contractor.

35. However, in March of 2021, SFX learned that its customers were being solicited by Mr. Pimentel, and discovered that he had created Transcendent.

36. Even worse, SFX discovered also that Defendants had been soliciting and performing work for SFX's customers, even while he was still employed with SFX.

37. Indeed, SFX has learned of at least ten purchase orders from its customer, New England Labs LLC, for work performed by Transcendent while Mr. Pimentel was still employed with SFX. True and correct copy of email correspondence from New England Labs to SFX identifying purchase orders for work performed by Transcendent is attached as **Exhibit A**.

38. SFX has discovered also that Transcendent fulfilled orders for Lab Design, another of SFX's customers, while Mr. Pimentel still was employed with SFX.

39. SFX also has received confirmation from at least two other customers, Lab Crafters, Inc., and Spencer-Virnoche, Inc., that they had been contacted by Mr. Pimentel while he was employed at SFX, and that he asked them to book work with Transcendent instead.

40. At no time did Mr. Pimentel disclose to SFX that Defendants were soliciting and performing work for its customers.

41. Not only did SFX discover that Defendants has been soliciting and working for its clients while Mr. Pimentel was still its employee, but SFX discovered also that Defendants had posted images of SFX's work on Transcendent's website and their social-media accounts as purported examples of the work performed by Transcendent. True and correct copies of screenshots of the images posted to Defendants' social-media account and website, along with explanatory notes from SFX about each picture are attached as **Exhibit B**.

42. By using images of SFX's work to advertise Transcendent's services on its website and social-media accounts, Defendants' intended that viewers would believe that the work had been performed by Transcendent.

43. If it were not bad enough that Defendants were stealing SFX's customers while Mr. Pimentel was SFX's employee, Defendants used SFX's workers and equipment to perform the work.

44. In Mr. Pimentel's role as foreman, SFX entrusted him with equipment and a vehicle allowance.

45. Mr. Pimentel was also authorized to purchase equipment for SFX, at SFX's cost.

46. However, Mr. Pimentel failed to return much of the equipment that SFX entrusted to him.

47. Mr. Pimentel was using his SFX vehicle allowance to drive to Transcendent projects, while he was working for SFX.

48. Not only was Mr. Pimentel misappropriating SFX's equipment and his vehicle allowance, but he also was directing members of SFX's "north crew" to work on projects for Transcendent while they were employed with SFX.

49. Indeed, an audit by SFX of Mr. Pimentel's timekeeping records for the seventeen-month period from August 2019 through December 2020 revealed that he was reporting excessive amounts of overtime worked on SFX projects.

50. Upon information and belief, Mr. Pimentel took time away from his job at SFX to work on projects for Transcendent, while reporting to SFX that he needed the time for vacations or emergencies.

51. Moreover, Mr. Pimentel took advantage of the lulls in SFX's activity that resulted from directing projects away from it, by using SFX's workers on Transcendent's projects.

52. At least one of SFX's employees has confirmed to SFX that he worked on a project for Transcendent at Mr. Pimentel's direction, while still employed with SFX.

C. **Defendants Misappropriate SFX's Trade Secrets To Solicit SFX's Clients Unlawfully.**

53. To solicit SFX's customers, Mr. Pimentel used confidential information on its customers and prices, through his access to the VPN.

54. Specifically, Mr. Pimentel accessed past proposals and contracts, which informed him what prices he could charge SFX's customers, to underbid SFX and to receive the work instead.

55. Further, as SFX is an installer of specialty laboratory equipment, there is only a small number of dealers, and a small number of potential consumers, of it. SFX was able to

identify these participants in the market for specialty laboratory equipment, only through substantial investment into market research.

56. SFX protects the secrecy of the identities of these dealers and customers by disclosing them only to SFX's employees on a need-to-know basis, and to employees of rank through the secure VPN.

57. Therefore, the identities of the suppliers and customers of the equipment installed by SFX are trade secrets themselves.

58. In addition, because the laboratory equipment was specialized, it could only be installed according to specific means and methods, which are protected trade secrets. To protect these trade secrets, SFX shares these means and methods only with its employees, such as Mr. Pimentel.

59. Not only did Mr. Pimentel use SFX's confidential information to solicit SFX's customers while he was still employed with SFX, but he retained SFX's confidential information after he left the company, and continues to use it to solicit bids for Transcendent.

60. After he left SFX, Mr. Pimentel solicited SFX's employees to quit working for SFX, and to work for Transcendent instead.

61. When these SFX employees left to work at Transcendent, the projects on which they were working became delayed until they were replaced, and SFX incurred costs associated with those delays.

D. **Defendants Refuse To Refrain From Soliciting SFX's Customers, Or To Reimburse SFX For The Labor And Equipment Taken By Them.**

62. On March 29, 2021, SFX sent Defendants a letter, in which SFX demanded that they cease and desist (i) from submitting bids to SFX's customers that are based on SFX's confidential information regarding its prices and customers, and (ii) from using images of SFX's

8

work on their website and social-media accounts. SFX requested also that Defendants compensate it for the labor and equipment taken by them to start Transcendent, and for the revenue lost on projects stolen by Defendants.

63. In response to SFX's cease-and-desist letter, Defendants filed a lawsuit in the New Jersey Superior Court for Burlington County, captioned *Jeral Pimentel and Transcendent Builders Const. Corp. v. SFX Installation, Inc., Scientifix, LLC, Michael Storms and John Does 1-100*, and assigned Case Number 849-21, in which he brought claims against SFX and its co-defendants under the New Jersey Law against Discrimination, the New Jersey Wage Payment Law, the New Jersey Wage and Hour Law, as well as a claim for tortious interference under the common law.

64. Defendants did not indicate that they would cease and desist from soliciting SFX's customers using its confidential customer information, nor did it offer to reimburse SFX for the equipment, labor, and revenues that it misappropriated.[2]

65. To recover the value of SFX's labor and equipment misappropriated by Defendants, as well as the revenues lost as a result of Defendants' scheme, SFX is constrained to bring this action.

## COUNT I
**Volitions Of The Defend Trade Secrets Act, 18 U.S.C.A. § 1831 *et seq.***
**(SFX v. Defendants)**

66. SFX hereby incorporates the foregoing paragraphs of this Complaint by reference as though fully set forth at length herein.

---

[2] Defendants did, however, remove some images of SFX's work from their websites and social-media accounts.

67. SFX's information regarding the different prices charged to customers is business and economic information that is a "trade secret" under the Defend Trade Secrets Act (the "DTSA").

68. The identities of SFX's customers and the dealers of the laboratory equipment that it installs, are also protected business information that is a trade secret.

69. The means and methods of installing the specialized laboratory equipment is likewise a protected trade secret.

70. SFX's confidential customer and pricing information are used in interstate commerce, as SFX performs installation and renovation services in multiple states.

71. SFX takes reasonable steps to protect information regarding its customers and prices, by keeping it on the VPN, to which only employees of rank have access.

72. SFX protects the means and methods for installing the specialty laboratory equipment, by teaching them only to its employees.

73. SFX's information regarding the prices charged to its customers derives independent value from being unknown to SFX's competitors, because it allows SFX to fashion bids for work that it knows are likely to be accepted, based on the bids that the customer has accepted in the past.

74. Defendants misappropriated SFX's confidential customer and pricing information, as they used it to create bids targeted towards SFX's customers, without SFX's consent.

75. Indeed, at the time that Defendants were soliciting SFX's clients, Mr. Pimentel was under a duty to maintain the secrecy of that confidential information.

76. Defendants also misappropriated SFX's trade secrets by using its proprietary means and methods to install specialized laboratory equipment for SFX's customers.

77. SFX has been damaged by Defendants' misappropriation of trade secrets, as they have lost revenue on the projects on which they were underbid by Defendants using SFX's confidential customer and pricing information.

78. Further, Defendants' use of SFX's confidential customer and pricing information has caused SFX irreparable in the form of lost market share, diminished good will and reputation, and lost future business opportunities.

79. Defendants' use of images of SFX's work on their websites and social-media accounts also causes SFX to lose market share, suffer diminished good will and reputation, and lost future business opportunities.

80. Absent an injunction, SFX has no adequate remedy at law to prevent Defendants from continuing to use its confidential customer and pricing information to solicit its customers, and continue to cause it irreparable injury, as well as future lost revenues.

81. Injunctive relief would not cause Defendants hardship, as they would be precluded only from continuing conduct that is unlawful under the DTSA. The absence of an injunction would subject SFX to hardship, on the other hand, because Defendants would be allowed to continue to cause it irreparable harm.

82. Granting an injunction would not be against the public interest, as the injunction would be to enforce the DTSA, in which the public has an interest.

**WHEREFORE**, SFX respectfully requests that the Court enter an order in its favor and against defendants, and to award SFX the following relief:

i. A permanent injunction against Defendants from soliciting or doing business with any and all customers or potential customers to which Mr. Pimentel first gained access through his work at SFX;

ii. A permanent injunction against Defendants from publishing, using, releasing or disclosing any sales data or records, customer lists, potential customer lists, and customer pricing data or records belonging to SFX;

iii.       A permanent injunction against Defendants from publishing, using, releasing or disclosing any images of SFX's work on their websites or social-media accounts;

iv.       An injunction mandating Defendants to identify and immediately return to SFX any and all sales data or records, customer lists, potential customer lists, and/or customer pricing data or records belonging to SFX, which are within Defendants' possession;

v.       An award to SFX of compensatory and consequential damages that it has suffered, including the revenue wrongfully derived by Defendants through their misappropriation of SFX's trade secrets;

vi.       An award to SFX of pre-judgment and post-judgment interest;

vii.       An award to SFX for its attorneys' fees;

viii.       An award to SFX of costs of suit; and

ix.       The entry of such other and further relief in favor of SFX as the Court deems just and proper.

## COUNT II
### Volitions Of The New Jersey Trade Secrets Act, N.J.S.A. 56:15-1, *et seq.*
### (SFX v. Defendants)

83.     SFX hereby incorporates the foregoing paragraphs of this Complaint by reference as though fully set forth at length herein.

84.     SFX's customer information, including their identities, the services that they have purchased from SFX, and the prices paid for these services, provides SFX with independent economic value. Indeed, the customer information is valuable to SFX, because it allows SFX to make informed bids that are likely to be accepted, and to allocate marketing resources to those past customers that have accepted bids from SFX in the past, and are likely to do so again.

85.     The identities of SFX's customers and the dealers of the laboratory equipment that it installs, are also protected business information that is a trade secret.

86.     The means and methods of installing the specialized laboratory equipment is likewise a protected trade secret.

87. SFX makes reasonable efforts to maintain the secrecy of its customer information, including by keeping that information on the secured VPN, to which only employees of rank are given access.

88. The means and methods for installing the specialty laboratory equipment are kept secret also, and only taught to SFX's employees.

89. In other words, SFX's customer information on the VPN is a "trade secret" as defined under the New Jersey Trade Secrets Act (the "NJTSA").

90. Defendants used SFX's customer information without SFX's consent to do so.

91. Indeed, Defendants used SFX's customer information to fashion bids to submit to SFX's customers at prices they knew would be lower than the prices charged by SFX for the same work.

92. Defendants also misappropriated SFX's trade secrets by using its proprietary means and methods to install specialized laboratory equipment for SFX's customers.

93. Defendants wrongfully used SFX's trade secrets to compete with SFX, even while Mr. Pimentel was still employed there.

94. Defendants continue to engage in this misconduct, and continue to use SFX's customer information to underbid SFX on projects with its existing customers.

95. Defendants' misappropriation of SFX's customer information was willful and malicious.

96. SFX has been damaged by Defendants' misappropriation of trade secrets, as they have lost revenue on the projects on which they were underbid by Defendants using SFX's confidential customer and pricing information.

97. Further, Defendants' use of SFX's confidential customer and pricing information has caused SFX irreparable in the form of lost market share, diminished good will and reputation, and lost future business opportunities.

98. Defendants' use of images of SFX's work on their websites and social-media accounts also causes SFX to lose market share, suffer diminished good will and reputation, and lost future business opportunities.

99. Absent an injunction, SFX has no adequate remedy at law to prevent Defendants from continuing to use its confidential customer and pricing information to solicit its customers, and continue to cause it irreparable injury, as well as future lost revenues.

100. Injunctive relief would not cause Defendants hardship, as they would be precluded only from continuing conduct that is unlawful under the NJTSA. The absence of an injunction would subject SFX to hardship, on the other hand, because Defendants would be allowed to continue to cause it irreparable harm.

101. Granting an injunction would not be against the public interest, as the injunction would be to enforce the NJTSA, in which the public has an interest.

**WHEREFORE**, SFX respectfully requests that the Court enter an order in its favor and against defendants, and to award SFX the following relief:

i. A permanent injunction against Defendants from soliciting or doing business with any and all customers or potential customers to which Mr. Pimentel first gained access through his work at SFX;

ii. A permanent injunction against Defendants from publishing, using, releasing or disclosing any sales data or records, customer lists, potential customer lists, and customer pricing data or records belonging to SFX;

iii. A permanent injunction against Defendants from publishing, using, releasing or disclosing any images of SFX's work on their websites or social-media accounts;

iv. An injunction mandating Defendants to identify and immediately return to SFX any and all sales data or records, customer lists, potential customer lists, and/or customer pricing data or records belonging to SFX, which are within Defendants' possession;

v. An award to SFX of compensatory and consequential damages that it has suffered, including the revenue wrongfully derived by Defendants through their misappropriation of SFX's trade secrets;

vi. An award to SFX of pre-judgment and post-judgment interest;

vii. An award to SFX for its attorneys' fees

viii. An award to SFX of costs of suit; and

ix. The entry of such other and further relief in favor of SFX as the Court deems just and proper.

## COUNT III
### Breach Of Duty Of Loyalty
### (SFX v. Mr. Pimentel)

102. SFX hereby incorporates the foregoing paragraphs of this Complaint by reference as though fully set forth at length herein.

103. Mr. Pimentel owed a duty of loyalty to SFX, as its employee.

104. This duty includes a duty not to use information confidentially given to him by SFX.

105. Mr. Pimentel's duty of loyalty also forbids him from seizing business opportunities from SFX, through the use of information available to him as SFX's employee, or from competing with SFX directly while employed there.

106. Mr. Pimentel was given access to the VPN where SFX keeps its confidential customer information, solely because he was a foreman employed by SFX.

107. Indeed, SFX takes measures to safeguard its customer information, including by allowing only employees of rank to access the VPN where it is kept.

108. Mr. Pimentel used SFX's confidential customer information to solicit SFX's customers, and to offer to perform the same work as SFX, but as a lower price.

109. In other words, Mr. Pimentel used information he received from SFX regarding their customers' identities, and the prices paid by them for various services, to create bids below SFX's bids on projects with these customers.

110. To submit these bids and to perform the work for SFX's customers, Mr. Pimentel created a competing company, *i.e.* Transcendent.

111. Mr. Pimentel's misuse of SFX's confidential customer information to solicit its customers with lower bids for the same work, is a breach of his duty of loyalty to SFX.

112. Mr. Pimentel's creation of a competing company to solicit of customers that he identified through his position as an employee of SFX is also a breach of his duty of loyalty to SFX.

113. SFX has been caused damage by Mr. Pimentel's breaches of his duty of loyalty.

114. Indeed, SFX has lost revenue on the projects that it lost to Defendants as a result of Mr. Pimentel's wrongful solicitations.

**WHEREFORE**, SFX respectfully requests that the Court enter an order in its favor and against defendants, and to award SFX the following relief:

i. An award to SFX of compensatory and consequential damages that it has suffered, including the revenue wrongfully derived by Defendants through Mr. Pimentel's breach of his duty of loyalty to SFX;

ii. An award to SFX of pre-judgment and post-judgment interest;

iii. An award to SFX of costs of suit; and

iv. The entry of such other and further relief in favor of SFX as the Court deems just and proper.

## COUNT IV
### Tortious Interference With Business Relationships
### (SFX v. Defendants)

115. SFX hereby incorporates the foregoing paragraphs of this Complaint by reference as though fully set forth at length herein.

116. SFX had a reasonable expectation of economic advantage from its existing customers, with whom SFX previously had contractual relationships.

117. Defendants interfered with these customer relationships by using SFX's confidential customer information to target its customers, and to submit bids at prices lower than those offered by SFX for the same services.

118. Defendants' theft of SFX's confidential customer information, for the purpose of underbidding SFX on projects with its customers, is tortious and is contrary to notions of free and fair competition.

119. Defendants' tortious interference with SFX's existing customers was willful and malicious.

120. SFX has been damaged by Defendants' tortious interference with its business relationships.

121. Indeed, SFX has lost revenue from projects that were taken by Defendants, though their wrongful use of SFX's confidential customer information.

**WHEREFORE**, SFX respectfully requests that the Court enter an order in its favor and against defendants, and to award SFX the following relief:

i. An award to SFX of compensatory and consequential damages that it has suffered, including the revenue wrongfully derived by Defendants through Mr. Pimentel's breach of his duty of loyalty to SFX;

ii. An award to SFX of pre-judgment and post-judgment interest;

iii. An award to SFX of costs of suit; and

  iv.  The entry of such other and further relief in favor of SFX as the Court deems just and proper.

## COUNT V
### Conversion
### (SFX v. Defendants)

122. SFX hereby incorporates the foregoing paragraphs of this Complaint by reference as though fully set forth at length herein.

123. Mr. Pimentel used his control over SFX's workers and equipment, which control he had through his position as foreman, to direct those resources to Transcendent's projects instead.

124. In addition, Mr. Pimentel used SFX's EZ-Pass account and his vehicle allowance to travel to and from Transcendent's projects.

125. Mr. Pimentel did not have authorization to use SFX's employees, vehicle allowance, or equipment on Transcendent's projects.

126. Defendants did not compensate SFX for the use of these resources.

127. Defendants' conversion of SFX's employees, equipment, vehicle allowance, and EZ-Pass, was willful and malicious.

128. SFX has been damaged by Defendants' conversion of its workers and property.

129. Indeed, SFX paid for these workers and this equipment, but not receive the benefit of what it paid for, because the benefit was wrongly converted by Defendants for their use.

**WHEREFORE**, SFX respectfully requests that the Court enter an order in its favor and against defendants, and to award SFX the following relief:

 i.  An award to SFX of compensatory and consequential damages that it has suffered;

 ii.  An award to SFX of pre-judgment and post-judgment interest;

 iii.  An award to SFX of costs of suit; and

iv.     The entry of such other and further relief in favor of SFX as the Court deems just and proper.

                                                         **COHEN SEGLIAS PALLAS**
                                                         **GREENHALL & FURMAN, P.C.**

Date: May 17, 2021                 By: _____
                                                         Jonathan Landesman, Esq. (253002019)
                                                         Carl L. Engel Esq. (201308320)
                                                         1600 Market St., 32nd Floor
                                                         Philadelphia, PA 19103
                                                         Tel.: (215) 564-1700
                                                        jlandesman@cohenseglias.com
                                                        cengel@cohenseglias.com
                                                       *Attorney for Plaintiff, SFX Installation, Inc.*

## **VERIFICATION**

I, Michael Storms, depose and say that (i) I am a principal of SFX Installation, Inc., and am authorized to make this Verification on its behalf, and (ii) the facts set forth in the foregoing *Complaint* are true and correct to the best of my personal knowledge, information, and belief. I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Date: May 17, 2021            By: _____
                                  Michael Storms
                                  SFX Installation, Inc.