NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| SFX INSTALLATION, INC., <br><br> Plaintiff, <br> v. <br><br> JERAL PIMENTEL and TRANSCENDENT BUILDERS CONSTRUCTION CORP., <br><br> Defendants. | Civ. No. 21-cv-11326 <br><br> **OPINION** |

THOMPSON, U.S.D.J.

## INTRODUCTION

This matter comes before the Court upon the Motion for Preliminary Injunction filed by Plaintiff SFX Installation, Inc. ("SFX") (ECF No. 7.) Defendants Jeral Pimentel and Transcendent Builders Construction Corp. ("Defendants") oppose. (ECF No. 21.) The Court has decided the Motion based upon the parties' written submissions and an evidentiary hearing conducted on September 22, 2021. For the reasons stated herein, Plaintiff's Motion (ECF No. 7) is granted.

## BACKGROUND

**I.  Procedural History**

On May 17, 2021, SFX filed a Complaint seeking injunctive relief and monetary damages against a former employee, Jeral Pimentel ("Pimentel"), for allegedly using SFX resources and employees to start a competing business while still working at SFX. (Compl. ¶ 1, ECF No. 1.) SFX alleges that the Defendants violated the Defend Trade Secrets Act, 18 U.S.C. §§ 1831 et seq., the New Jersey Trade Secrets Act, N.J.S. 56:15-1, et seq., and common law

1

claims of conversion and tortious interference with business relationships. (*Id.* ¶¶ 66–101, 115–29.) Additionally, SFX alleges that Pimentel breached his duty of loyalty as an employee of SFX. (*Id.* at ¶¶ 102–14.)

SFX filed a Motion for Preliminary Injunction on June 7, 2021 (ECF No. 7), and a Motion for Expedited Discovery on June 8, 2021 (ECF No. 8). On June 18, 2021, the Court held a hearing via video conferencing regarding these motions, where it granted the Motion for Expedited Discovery and ordered the parties to set an expedited discovery schedule. (ECF No. 12.) On September 22, after expedited discovery and additional briefing, the Court held an evidentiary hearing on the preliminary injunction. (ECF No. 22.) Defendant Pimentel and SFX Director of Operations, Mike Storms ("Storms"), testified at the hearing.

## II.     Findings of Fact

SFX installs specialty laboratory equipment. (Prelim. Inj. Hr'g at 12:4–13:8, ECF No. 23.) SFX's customers are "dealers for laboratory furniture manufacturers," and SFX typically works for "four to six" of these customers at a time. (*Id.* at 74:23–75:3.)

Pimentel worked for SFX from December 2016 through January 2021. (*Id.* at 11:23–12:3.) SFX initially hired Pimentel as a "carpenter helper" in December 2016 (*id.* at 12:25–13:4), and in May 2018, SFX promoted Pimentel to "carpenter foreman" in charge of SFX's "north crew," (*id.* at 13:9–10, 14:23–24.) SFX trained Pimentel in the "specialized trade" of laboratory equipment installation, where he worked "under a very experienced carpenter or foreman." (*Id.* at 74:18–75:25.)

As "carpenter foreman," Pimentel "over[saw] logistics, programming[,] and multiple job sites" and "the company's manpower," "hire[d] employees for SFX, and "supervised SFX's north crew." (*Id.* at 14:9–24.) The promotion also included an hourly pay increase from $30 to

$40. (*Id.* at 12:15–13:1, 14:25–15:1.) He was given access to the "VPN," a secure "computer facility" where SFX stores important customer pricing information, proposals, and bids. (*Id.* at 13:14–14:2; 80:3–6.) Pimentel received a car allowance for $500 per month, a company cell phone, and a company computer. (*Id.* at 15:3–13.) He also had access to a storage unit containing SFX equipment, which SFX "fully trusted" him to access without permission. (*Id.* at 81:7–17.)

The workflow at SFX included both busy and slow periods. (*Id.* at 76:20–2.) During the slow periods, SFX would "notify the guys" who would "collect unemployment for a few weeks" before the work "start[ed] back up." (*Id.* at 76:24–77:2.) This workflow "happen[ed] all the time," and SFX referred to these slow weeks as "layoffs," typically lasting "a few weeks at a time." (*Id.* at 77:4–8.)

In the summer of 2019 and while still working at SFX, Pimentel formed Transcendent, of which he is the president and sole owner. (*Id.* at 29:14–15, 38:4–6.) Pimentel obtained work for Transcendent by contacting dealers of laboratory equipment and other types of dealers, including SFX customers Lab Design, H2I, and Lab Crafters, whom he met while working at SFX. (*Id.* at 28:15–20, 50:9–15, 53:5–11.) In one instance, he solicited an individual from Lab Crafters for Transcendent and later, "about a month before" he resigned from SFX, met the same individual in his capacity as an SFX employee. (*Id.* at 53:4–54:16.) He did not inform anyone at SFX about the formation of Transcendent or his solicitation of customers for Transcendent. (*Id.* at 29:16–30:3.) Pimentel claims that he did not meet these customers through SFX, but through "a lot of research and cold calls." (*Id.* at 50:18–19, 65:16–66:1.) He contends that he did not inform SFX about the solicitation because he did not know he was soliciting SFX customers. (*Id.* at 29:5–24.)

Pimentel claims that, despite having access to SFX's customer and pricing information on the VPN, he did not use or take that information to craft prices for Transcendent customers.

3

(*Id.* at 13:21–14:8.)[1] Rather, he contends, Transcendent submits bids based on "what time and what costs it's going to take for the job to be performed" and has "los[t] a lot" in this process by "performing jobs for prices that [he] did [not] know how to give." (*Id.* at 66:6–19.)

Starting in February 2020, Transcendent performed several projects for SFX customers involving the same specialty lab equipment installation that SFX performs. (*Id.* at 38:7–52:8.) This includes at least seven projects with Lab Design and New England Labs, and several projects with other dealers. (*Id.* at 38:7–49:12, 51:4–14.) Some of these projects occurred during a period in which SFX had "laid [Pimentel] off" due to COVID-19, from approximately March 2020 through June 2020, with "a week and half in May" of work. (*Id.* at 39:10–21.) Pimentel claims that, despite his position as a foreman and "superintendent" at SFX, he did not understand that the installation work that he performed with Transcendent was the same type of work and for the same customers as the work that he performed with SFX. (*Id.* at 50:1–8.) Pimentel did not inform anyone at SFX about these projects; rather, SFX learned about them through the customers. (*Id.* at 78:24–79:13, 82:5–9.)

Pimentel also appears to have used SFX time, employees, and resources to do work for Transcendent. At the hearing, SFX presented EZ-Pass records and Home Depot receipts indicating work and purchases for Transcendent on dates which Pimentel's SFX timecards indicate he worked full days for SFX. (*Id.* at 17:13–28:10; *see also* Pl.'s Br., Exs. I, J, ECF Nos. 20-9, 20-10.) He employed five "laid off" SFX employees to perform Transcendent jobs. (Prelim. Inj. Hr'g at 30:4–6, 60:18–63:7.) He occasionally used his SFX cell phone to make solicitation calls for Transcendent, until he got his own phone around April or May of 2020. (*Id.*

---

[1] The Court questions the credibility of Pimentel's testimony on this topic and the accompanying Order seeks to determine whether he in fact did not access the confidential information on the VPN.

4

at 31:10–32:14.) He posted photos of SFX projects on Transcendent's social media page. (*Id.* at 55:21–23.) At least one time, he used an SFX "fume hood jack" to install a fume hood and his SFX vehicle to transport the fume hood for a Transcendent project. (*Id.* at 56:19–57:2.) He has since returned the jack, and no other "heavy equipment" is missing from SFX. (*Id.* at 81:2–22.)

New England Labs, H2I, Lab Crafters, and Lab Designs, all SFX customers at one time, constitute "give or take" seventy-five percent of Transcendent's business in 2021, and Transcendent continues to work with them. (*Id.* at 69:4–13.) Many former SFX employees continue to work for Transcendent. (*Id.* at 69:14–18, 76:9–16.) And, according to Storms, some "small hand tools" were "not accounted for" after Pimentel left. (*Id.* at 81:18–22.)

When Pimentel resigned, he did not tell SFX about Transcendent. (*See id*. at 58:1–25.) He submitted a letter thanking the company and resigning "due to personal reasons." (Pl.'s Br., Ex. G, ECF No. 20-7.) He cleared all communications from his company phone and computer. (Prelim. Inj. Hr'g at 59: 9–10.) When SFX learned of his solicitation, it sent him a cease-and-desist letter, requesting that he stop submitting bids to SFX customers and using images of SFX's work on Transcendent's website. (Pl.'s Br. at 12.) Defendants removed the pictures from the website but continue to solicit SFX customers for Transcendent. (*See id.*)

Notably, when Pimentel resigned, he told the company that he was considering taking a job with a "large commercial general contractor called Gilbane." (*Id.* at 58:7–21.) He stated in his resignation letter "how grateful [he was for] this organization and the opportunities, experiences[,] and challenges that it has given [him] in the past 4 years," and that his time at SFX had "shaped and allowed [him] to grow both as an individual and a professional." (Pl.'s Br., Ex. G.) He also stated that he was resigning "with a heavy heart," and that he "wish[ed] and pray[ed] for SFX[] . . .and for many years of success to come." (*Id.*)

5

## LEGAL STANDARD

To obtain a preliminary injunction, the moving party must show: "(1) a reasonable probability of eventual success in the litigation, . . . (2) that it will be irreparably injured . . . if relief is not granted . . . (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest." *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (citing *Del. River Port Auth. v. Transamerican Trailer Transp., Inc.*, 501 F.2d 917, 919–20 (3d Cir. 1974)). "[A] district court—in its sound discretion—should balance those four factors so long as the party seeking the injunction meets the threshold on the first two." *Id.* (citing *Oburn v. Shapp*, 521 F.2d 142, 147 (3d Cir. 1975)). The moving party must show a "significantly better than negligible but not necessarily more likely than not" ability to win on the merits and "that it is more likely than not to suffer irreparable harm in the absence of preliminary relief." *Id.* at 179. "How strong a claim on the merits is enough depends on the balance of the harms: the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief." *Id.* at 179 (citation omitted). The court retains "the traditional flexibility to granting interim equitable relief in which the district court has full discretion to balance the four factors once gateway thresholds are met." *Id.* at 178 (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008)).

## DISCUSSION

SFX argues that there is a reasonable probability of success on the merits that Defendants violated the Defend Trade Secrets Act, 18 U.S.C. §§ 1831 et seq. ("DTSA") and the New Jersey Trade Secrets Act ("NJTSA"), N.J.S. 56:15-1, et seq., and that Pimentel breached his duty of loyalty. (Pl.'s Br. at 12–13, ECF No. 20.)

6

I.     **The Defend Trade Secrets Act and New Jersey Trade Secrets Act**

The Court finds that there are not sufficient facts to determine with "reasonable probability" that Pimentel misappropriated trade secrets under the Defend Trade Secrets Act (DTSA) or New Jersey Trade Secrets Act (NTSA).

SFX alleges that its installation "means and methods" are protectable trade secrets. (Compl. ¶¶ 69, 92.) While Storms testified that laboratory furniture installation was a "specialized trade", and that Pimentel learned his skills at SFX (Prelim. Inj. Hr'g at 74:18–22), the Court cannot determine whether these methods are protectable trade secrets versus "general knowledge within the industry," which is not protected. *Sun Dial Corp. v. Rideout*, 16 N.J. 252, 257 (1954). SFX also alleges that Pimentel used its "confidential" customer, pricing, and bid lists. (Compl. ¶¶ 74, 89.) While New Jersey courts have found that certain "customer lists of service business have been afforded protection as trade secrets," SFX has asserted insufficient evidence that Pimentel actually used the information protected by the VPN to solicit and submit bids to Transcendent clients. *See Lamorte Burns & Co. v. Walters*, 167 N.J. 285, 298 (2001).

II.    **Breach of Duty of Loyalty**

The duty of loyalty requires that "[a]n employee must not while employed act contrary to the employer's interest." *Id.* at 302. Even absent an employment agreement containing a restrictive covenant, an employee is bound by the duty of loyalty. *See id.* While "an employee has the right to make preparations to start a competing business, the employee may not breach the undivided duty of loyalty he or she owes to his or her employer while still employed by soliciting the employer's customers or engaging in other acts of secret competition." *Id.* at 303.

Courts look to several factors to determine whether an employee breached his duty of loyalty, including whether the employee "occup[ied] a position of trust and confidence" with the

employer, whether the employee told his employer about his "secondary profit-seeking activities," and the "nature of the employee's second source of income and its effect on the employer." *Cameco, Inc. v. Gedicke*, 157 N.J. 504, 516, 521 (1999). Employees should not "engage in conduct that causes their employers to lose customers, sales, or potential sales[, or] . . . take advantage of their employers by engaging in secret self-serving activities." *Id.* at 522. Nor may employees "purloin[] protected information from [the employer's files] while still employed," such as "specific information concerning the clients[.]" *Lamorte*, 167 N.J. at 301.

While the parties dispute whether Pimentel accessed the VPN to obtain confidential customer and pricing information (Prelim. Inj. Hr'g at 13:14–14:2), Pimentel admits to soliciting and conducting projects for SFX customers while employed with SFX. (*Id.* at 28:15–20, 50:9–15, 53:5–11.) Because these customers account for a majority of Transcendent's business (*id.* at 69:8–9, 83:17–20), Pimentel's solicitation likely "cause[d] [SFX] to lose customers, sales, [and] potential sales." *See Cameco, Inc.*, 157 N.J. at 522; *United Bd. & Carton Corp. v. Britting*, 63 N.J. Super. 517, 525 (Ch. Div. 1959), aff'd, 61 N.J. Super. 340 (App. Div. 1960) (finding that employees of paper sales company breached the duty of loyalty to their employer when they started a company that sold paper to employer's customers).

Additionally, the entrustment of the company's employees, vehicle, EZ-Pass card, phone, and tools to Pimentel suggest that he occupied a position of "trust and confidence" within SFX, which he breached by using the company's resources for solicitation and other work for Transcendent. *See Cameco, Inc.*, 157 N.J. at 516; *Platinum Mgmt., Inc. v. Dahms*, 285 N.J. Super. 274, 305 (Law. Div. 1995) (finding that employee breached the duty of loyalty by soliciting another employee for a direct competitor). And, the fact that Pimentel did not inform SFX about his "secondary profit-seeking activities" further supports the claim that he engaged in

"secret competition" with SFX. *Lamorte*, 167 N.J. at 303; *Cameco, Inc.*, 157 N.J. at 521. Thus, there is a reasonable probability that SFX will succeed on its breach of loyalty claim.

### III.     Irreparable Injury

Defendants argue that a preliminary injunction is not the appropriate remedy because, absent a non-solicitation agreement, "an employee is allowed to compete." (Prelim. Inj. Hr'g at 6:14–23.) And, because Pimentel claims that he is "not using any confidential information" to solicit customers or fashion bids, there is no irreparable injury to SFX that is only curable by an injunction. (*Id.* at 7:13–21.) Thus, Defendants contend that "[a]ny alleged breach of duty of loyalty violations would be cured by damages for past harm." (Def.'s Br. at 14, ECF No. 21-1.)

The Court notes the absence of a non-solicitation agreement and the importance of "free enterprise and the wholesome benefits which fair and honest competition creates." *See United Bd.*, 63 N.J. Super. at 534. However, "an employee's breach of the duty of loyalty can give rise to either equitable or legal relief." *Cameco, Inc.*, 157 N.J. at 518. And, "[t]he egregiousness of the employee's conduct may affect the determination of both the commission of a breach *and the appropriate remedy*." *Id.* at 517 (emphasis added).

Accordingly, a court may issue an injunction against a former employee who, "in violation of the duty owed to their employer, have gone into secret competition with him, while still enjoying [the] trust and the benefits of their employment." *United Bd.*, 63 N.J. Super. at 530. In *United Board*, the court enjoined former employees from "soliciting or doing business" with customers of their former employer when, while employed, they secretly incorporated a competing company, diverted business to the company, removed customer property from the former employer, brought other employees to the competing company, and used the former employer's contacts to solicit customers. *Id.* at 522, 534. The court found, where there was "no

9

adequate remedy at law by a mere award of money damages for the obvious acts of disloyalty by the defendants, while they were still in [the] plaintiff's employ, . . . some measure of injunctive relief [was] necessary to give the plaintiff a fair and equal opportunity in the competition between it and its disloyal former employees to obtain the business involved." *Id.* at 522.

Here, SFX has asserted facts to show that, similarly to the employees in *United Board*, Pimentel acted in "secret competition with [SFX], while still enjoying [the] trust and benefits of [its] employment": Without telling SFX, he formed Transcendent (Prelim. Inj. Hr'g at 29:16–24), solicited customers for Transcendent (*id.* at 31:15–45:10), conducted the same type of laboratory installation projects as SFX (*id.* at 45:6–10), used SFX property to solicit and work for Transcendent (*id.* at 31:10–32:14, 55:18–25) and brought SFX employees to work for Transcendent (*id.* at 30:4–6, 60:18–63:7). *See* 63 N.J. Super. at 522, 530. And, because SFX lost a significant percentage of its customers to Transcendent because of Pimentel's conduct (Prelim. Inj. Hr'g at 69:4–13), "some measure of injunctive relief is necessary to give [SFX] a fair and equal opportunity in the competition between it and [Transcendent] to obtain the business involved." *See id.* at 522. Thus, the Court finds that SFX has asserted facts to demonstrate that it suffered irreparable injury when Transcendent took its customers, and still suffers irreparable injury because Transcendent continues to solicit and work for former SFX customers, and employ former SFX employees. (*See* Prelim. Inj. Hr'g at 69:4–18, 76:9–16.)

The remaining two factors under the preliminary injunction standard – possibility of harm to other interested persons from the grant or denial of the injunction and the public interest – do not tip the scale away from issuing a preliminary injunction. On balance, Pimentel's breach of loyalty was sufficiently "egregious"[] to warrant a temporary halt on Transcendent's dealings with the SFX customers that Pimentel solicited while employed by SFX. *See United Bd.*, 63 N.J.

Super. at 534; *Cameco, Inc.*, 157 N.J. at 517–18. Thus, in the exercise of its discretion to give "either equitable or legal relief" for an employee's breach of loyalty, the Court finds that a preliminary injunction is an appropriate remedy. *See Cameco, Inc.*, 157 N.J. at 518.

## **CONCLUSION**

For the foregoing reasons, SFX's Motion for a Preliminary Injunction (ECF No. 7) is granted. An appropriate Order will follow.


Date: <u>October 8, 2021</u>                                            */s/ Anne E. Thompson*  
                                                                                   ANNE E. THOMPSON, U.S.D.J.